1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  WAYNE K. SNODGRASS, State Bar #148137
   AILEEN M. McGRATH, State Bar # 280846
3  JAMES M. EMERY, State Bar #153630
   Deputy City Attorneys
4  City Hall
   1 Dr. Carlton B. Goodlett Place, Room 234
5  San Francisco, California 94102-5408
   Telephone:    (415) 554-4691
6  Facsimile:     (415) 554-4699
   E-Mail:        aileen.mcgrath@sfcityatty.org
7                 jim.emery@sfcityatty.org

8  Attorneys for Defendants
   CITY AND COUNTY OF SAN FRANCISCO
9  SAN FRANCISCO MUNICIPAL TRANSIT AGENCY
   EDWARD D. REISKIN, DIRECTOR OF TRANSPORTATION

10

11

12                  UNITED STATES DISTRICT COURT

13               NORTHERN DISTRICT OF CALIFORNIA

14  SAN FRANCISCO TAXI COALITION,          Case No. 3:19-cv-01972-WHA
    PATRICK O'SULLIVAN, SAI LEE,
15  GEORGE HORBAL, ALLIANCE CAB and        **DEFENDANTS' MEMORANDUM OF POINTS
    S.F. TOWN TAXI INC.,                   AND AUTHORITIES IN OPPOSITION TO
16                                         PLAINTIFFS' MOTION FOR PRELIMINARY
           Plaintiffs,                     INJUNCTION**
17
           vs.                             Hearing Date:   May 30, 2019
18                                         Time:           8 a.m.
    CITY AND COUNTY OF SAN                 Place:          San Francisco Courthouse
19  FRANCISCO; SAN FRANCISCO                               Courtroom 12 - 19th Floor
    MUNICIPAL TRANSIT AGENCY;                              450 Golden Gate Avenue
20  EDWARD D. REISKIN, Director of                         San Francisco, CA  94102
    Transportation; and DOES 1 through 20,
21                                         Trial Date:     Not Set
           Defendants.
22                                         Attached Documents:
                                               • Declaration of Kate Toran
23                                             • [Proposed] Order

24

25

26

27

28

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ...................................................................................................... 1

BACKGROUND ........................................................................................................ 1

    I.     San Francisco Taxi Medallion Categories ............................................... 2

    II.    Taxi Industry Reform Efforts ................................................................... 3

    III.   2018 Taxi Reforms .................................................................................. 4

ARGUMENT ........................................................................................................... 6

    I.     Legal Standard ......................................................................................... 6

    II.    Plaintiffs Will Not Succeed On Their Claims ......................................... 6

        A.    The December 2018 Regulations Do Not Violate Equal Protection. .......... 6

           1.    Legal Standard ................................................................. 7

           2.    Plaintiffs Are Unlikely To Succeed On Their Equal Protection Claim. .......................................................................... 7

        B.    Plaintiffs Are Unlikely To Show The City Violated CEQA ..................... 10

           1.    Legal Standard ................................................................. 11

           2.    Plaintiffs Did Not Exhaust Their CEQA Claim. ............................ 11

           3.    SFMTA Properly Determined The Regulations Are Not a "Project." ........................................................................ 12

        C.    Plaintiffs Are Not Likely To Succeed On Their Age Discrimination Claim. ..................................................................................... 13

    III.   The Balance of Hardships Favors The City. ............................................ 14

CONCLUSION ......................................................................................................... 15

# <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Allied Concrete & Supply Co. v. Baker*
  (9th Cir. 2018) 904 F.3d 1053 ...................................................................9

*Allied Concrete & Supply Co. v. Brown*
  (C.D. Cal. 2016) 2016 WL 9275783 ...........................................................9

*Clements v. Fashing*
  (1982) 457 U.S. 957..................................................................................7

*F.C.C. v. Beach Communications, Inc.*
  (1993) 508 U.S. 307.............................................................................7, 10

*Greater Houston Small Taxicab Co. Owners Assn. v. City of Houston*
  (5th Cir. 2011) 660 F.3d 235 ......................................................................8

*Heller v. Doe*
  (1993) 509 U.S. 31..........................................................................7, 8, 10

*Hester v. Rizzo*
  (E.D. La. 1978) 454 F.Supp. 537 ................................................................8

*Hodel v. Indiana*
  (1981) 452 U.S. 314..................................................................................7

*Kansas City Taxi Cab Drivers Assn. LLC v. City of Kansas City*
  (8th Cir. 2013) 742 F.3d 807 ......................................................................8

*Kawaoka v. City of Arroyo Grande*
  (9th Cir. 1994) 17 F.3d 1227 ......................................................................7

*Merrifield v. Lockyer*
  (9th Cir. 2008) 547 F.3d 978 ......................................................................9

*Powers v. Harris*
  (10th Cir. 2004) 379 F.3d 1208 .................................................................10

*Sensational Smiles, LLC v. Mullen*
  (2d Cir. 2015) 793 F.3d 281 ......................................................................10

*St. Joseph Abbey v. Castille*
  (5th Cir. 2013) 712 F.3d 215 ......................................................................9

*U.S. Railroad Retirement Bd. v. Fritz*
  (1980) 449 U.S. 166..................................................................................9

**State Cases**

*Blumhorst v. Jewish Family Services of Los Angeles*
  (2005) 126 Cal.App.4th 993 .....................................................................14

*Bridges v. Mt. San Jacinto Community College Dist.*
  (2017) 14 Cal.App.5th 104 ..................................................................................11, 12

*Butt v. State of Cal.*
  (1992) 4 Cal.4th 668 ...................................................................................................6

*Comunidad en Accion v. Los Angeles City Council*
  (2013) 219 Cal.App.4th 1116 ...................................................................................14

*Cooley v. Super. Ct.*
  (2002) 29 Cal.4th 228 .................................................................................................7

*CREED–21 v. City of San Diego*
  (2015) 234 Cal.App.4th 488 .....................................................................................11

*Mani Brothers Real Estate Group v. City of Los Angeles*
  (2007) 153 Cal.App.4th 1385 ...................................................................................12

*Moreno v. Draper*
  (1999) 70 Cal.App.4th 886 .......................................................................................10

*Muzzy Ranch Co. v. Solano County Airport Land Use Comm'n*
  (2007) 41 Cal.4th 372 ...............................................................................................11

*Nelson v. Avondale Homeowners Assn.*
  (2009) 172 Cal.App.4th 857 .......................................................................................6

*No Oil, Inc. v. City of Los Angeles*
  (1974) 13 Cal.3d 68 ..................................................................................................11

*O'Connell v. Super. Ct.*
  (2006) 141 Cal.App.4th 1452 ...................................................................................15

*People v. Chatman*
  (2018) 4 Cal.5th 277 ...................................................................................................7

*People v. Travis*
  (2006) 139 Cal.App.4th 1271 .....................................................................................8

*People v. Turnage*
  (2012) 55 Cal.4th 62 .................................................................................................10

*Rominger v. County of Colusa*
  (2014) 229 Cal.App.4th 690 .....................................................................................11

*San Francisco Newspaper Printing Co. v. Super. Ct.*
  (1985) 170 Cal.App.3d 438 .........................................................................................6

*Sierra Club v. City of Orange*
  (2008) 163 Cal.App.4th 523 .....................................................................................11

*Tahoe Keys Property Owners' Assn. v. State Water Resources Control Bd.*
  (1994) 23 Cal.App.4th 1249 ............................................................15

*Union of Medical Marijuana Patients, Inc. v. City of San Diego*
  (2016) 4 Cal.App.5th 103,
  review granted, (Jan. 11, 2017)386 P.3d 795 ........................................13

*Union of Medical Marijuana Patients, Inc. v. City of Upland*
  (2016) 245 Cal.App.4th 1265 ..........................................................12

*Wal-Mart Stores, Inc. v. City of Turlock*
  (2006) 138 Cal.App.4th 273 ...........................................................11

*Warden v. State Bar*
  (1999) 21 Cal.4th 628 .................................................................7

*White v. Davis*
  (2003) 30 Cal.4th 528 ................................................................14

**Constitutional Provisions**
Cal. Const., Art. Article XII .............................................................3

**State Statutes & Codes**
Cal. Gov. Code § 11135.............................................................13, 14

Cal. Gov. Code § 11135(a) ..............................................................13

Cal. Pub. Resources Code §§ 21000, *et seq.*
  [Cal. Environmental Quality Act or CEQA] ................................... *passim*

Cal. Pub. Resources Code § 21065 ......................................................11

Cal. Pub. Resources Code § 21177(a) ...................................................12

Cal. Pub. Resources Code § 21177(b) ...................................................12

Cal. Pub. Resources Code § 21177(e) ...................................................12

Cal. Pub. Util. Code §§ 5351, *et seq.*
  [Charter-party Carriers' Act].........................................................3

**Regulations**
Cal. Code Regs., tit. 14, § 15060 ......................................................11

Cal. Code Regs., tit. 14, § 15060(c) ...................................................11

Cal. Code Regs., tit. 14, § 15060(c)(2) ................................................11

Cal. Code Regs., tit. 14, § 15064(d)(3) ................................................13

Cal. Code Regs., tit. 14, § 15378 ......................................................11

Cal. Code Regs., tit. 14, § 15378(a)(1) .......................................................................11

Cal. Code Regs., tit. 14, § 15382 ............................................................................11

**Other Authority**

CPUC Decision 13-09-045, "Order Instituting Rulemaking on Regulations Relating to Passenger
    Carriers, Ridesharing, and New Online-Enabled Transportation Services" (2013) ...................3

# INTRODUCTION

The San Francisco Municipal Transportation Agency ("SFMTA") works to ensure that San Francisco's ground transportation is as safe, healthy, accessible, and economical as possible. As part of that mission, and in connection with its exclusive authority over the City and County of San Francisco's taxi program, SFMTA recently adopted regulations controlling taxi pickups at the San Francisco International Airport ("SFO"). These regulations reduce the incentives taxi drivers previously had to cluster in the airport's taxi holding lots—a practice that created taxi congestion at the airport and unnecessarily depleted the fleet of taxis available for riders in San Francisco itself. They do this by limiting certain groups of medallion holders from picking up fares at SFO, granting expedited access for another set of medallion holders, and preserving standard access for a third group. In creating these different levels of access to airport fares, SFMTA took into account recent, previously unforeseen developments in the ground transportation industry that have disproportionately affected newer medallion holders. The regulations allow these newer holders increased access to fares at SFO, while encouraging other medallion holders to provide more services in the City.

Plaintiffs have challenged these regulations, arguing these distinctions among medallion holders violate the state and federal constitutions and discriminate on the basis of age. They argue San Francisco violated the California Environmental Quality Act ("CEQA"). And they ask this Court for the extraordinary remedy of a preliminary injunction prohibiting San Francisco from continuing to enforce these regulations, which were published in December 2018 and have been in effect for over two months.

The Court should deny Plaintiffs' motion for preliminary injunction. Plaintiffs cannot show they are likely to succeed on any of their legal claims. And even if they could, the balance of hardships tips sharply in favor of the City's ability to continue to implement its chosen policies.

# BACKGROUND

SFMTA has the power, under the San Francisco City Charter, to manage the City's ground transportation system. (Declaration of Kate Toran ("Toran Decl.") ¶ 3.) As part of that responsibility, the agency has exclusive authority to regulate taxi-related functions and taxi fares, fees, and charges. (*Id.*) SFMTA works to promote a vibrant taxi industry through intelligent regulation, enforcement,

and partnership with the taxi industry.  (*Id.* ¶ 5.)  The agency seeks to achieve public safety, outstanding customer service, economic and environmental sustainability, and accessibility for all San Francisco residents.  (*Id.*)

## I.    San Francisco Taxi Medallion Categories

One way SFMTA has carried out these efforts in recent years has been to address inequities in the taxi medallion system.  (*Id.* ¶ 7.)  A taxi medallion is a permit issued by SFMTA to an individual or business to operate a taxi in San Francisco.  (*Id.* ¶ 8.)  Taxicab permits are City property; they do not become the property of a medallion holder, and they do not create an entitlement.  (*Id.*)

There are several classes of medallions currently in operation in the City.  (*Id.* ¶ 9.)  **Corporate** medallions were issued prior to Proposition K ("Prop K") in 1978; they could, and continue to be, held by a company, companies can own more than one medallion, and the medallions have no associated driving requirement.  (*Id.*)  **Pre-K** medallions were likewise issued before Prop K was passed, have no driving requirement, and individuals can own more than one Pre-K medallion; the only difference from Corporate medallions is that individuals hold Pre-K medallions.  (*Id.*)  **Post-K** medallions were issued after 1978 to drivers at no cost, based on a waiting list.  (*Id.*)  Post-K medallions can only be held by individuals, an individual can only hold one Post-K medallion, and holders have a driving requirement.  (*Id.*)  **Purchased** medallion**s** were issued under the Medallion Sales Pilot Program, which started in 2010, and the Medallion Transfer Program, which began in 2012.  (*Id.*)  There are currently 79 Corporate medallions, 174 Pre-K medallions, 559 Post-K medallions, and 625 Purchased medallions in operation in the City.[1]  (*Id.*)

There are critical differences among the medallion categories, which primarily pertain to the driving requirement, the ability to transfer or surrender the medallions, and the investment that medallion holders have made and the returns they have realized.  Pre-K and Corporate medallions have been in operation for at least 40 years (and some for many more years than that).  (*Id.* ¶ 12.)  These medallions have earned approximately $1.6 million, per medallion, over their lifetime.  (*Id.*)  And because there is no driving requirement associated with these medallions, much of the income is

---

[1] There are also two smaller categories of medallions: Ramp taxi medallions issued to taxis operating wheelchair accessible ramp vehicles, and 8000-series medallions, which SFMTA leases to taxi companies for a monthly use fee.  (*Id.* ¶ 9.)

passive. (*Id.*) While many of these medallion holders paid to obtain their medallions, they have had over 40 years to realize a return on that investment. (*Id.* ¶ 14.) Similarly, Post-K medallion holders did not pay to obtain their medallions, never paid any fees on the secondary market, and have likewise had many years to profit from their medallions. (*Id.* ¶ 15.)

Purchased Medallion holders, by contrast, have only held their medallions for between three and nine years. They purchased their medallions under transfer and purchase programs that SFMTA instituted beginning in 2010. (*Id.* ¶¶ 16, 18-19.) Under these programs, subject to limited exceptions, purchasers paid $250,000 to obtain a medallion. (*Id.*) Many of these medallion holders financed their purchases with a loan from the San Francisco Federal Credit Union. (*Id.* ¶ 16.) The majority of these loans remain outstanding; indeed, many Purchased medallion holders still owe over $200,000 on their loans, and many pay between $1,500-$2,500 in loan payments each month. (*Id.* ¶¶ 16, 27.) Because of these increased overhead expenses, Purchased medallion holders, on average, earn far less than other medallion holders ($40,000 per year versus $54,000 per year, according to a recent study). (*Id.* ¶ 48; see also Request for Judicial Notice in support of Motion for Preliminary Injunction ("Pltfs' RJN"), Exh. F, p. 68.)

## II.    Taxi Industry Reform Efforts

These differences among medallion holders have been exacerbated in recent years, as the industry has been dramatically affected by the rise of Transportation Network Companies ("TNCs") like Uber and Lyft. (*Id.* ¶ 21.) At the time the City began issuing Purchased medallions, the taxi industry was healthy. (*Id.* ¶ 20.) Revenues from operating a taxi were sufficiently above the cost of operations—even for Purchased medallion holders—and taxi medallions were fully utilized. (*Id.*) But the proliferation of TNCs began to change all that, with an impact the City began to observe in 2014. (*Id.* ¶ 30.) The State Legislature has granted primary regulatory authority over TNCs to the California Public Utilities Commission ("CPUC").[2] TNCs are able to operate commercially with comparatively little regulation—they have no fare restrictions, need not have commercial driver's licenses, and tend

---

[2] Pursuant to Article XII of the California Constitution and the Charter-party Carriers' Act, Pub. Util. Code §§ 5351, *et seq.*, the CPUC has asserted regulatory authority over many aspects of TNCs' operations. CPUC Decision 13-09-045, "Order Instituting Rulemaking on Regulations Relating to Passenger Carriers, Ridesharing, and New Online-Enabled Transportation Services" (2013).

to have lower insurance premiums.  (*Id.* ¶ 21.)  They have rapidly changed the transportation landscape in San Francisco, as in other cities.  (*Id.* ¶ 22.)  TNC trip volumes now far outnumber taxi trip volumes—by some estimates, by nearly 12 to 1—and TNC ridership has caused a sharp decline in taxi ridership from SFO.  (*Id.* ¶ 22.)  For instance, recent data show that taxi trips from SFO declined from over 2 million annual trips in 2014 to slightly over 1 million annual trips in 2018.  (*Id.*)

SFMTA has tried many approaches to reduce the difficulties these changes have caused the taxi industry.  For instance, the agency is authorizing a number of new taxi stands, has eliminated certain taxi fees, and has modified requirements related to vehicle mileage and age to reduce costs.  (*Id.* ¶ 23.)  But despite these efforts, the industry suffered and Purchased medallion sales began to decline sharply and eventually stalled completely in 2016.  (*Id.* ¶ 24.)  After holding over a dozen meetings with the industry and related stakeholders, SFMTA engaged an outside consulting group—PFM Consulting and Schaller Consulting—to study the industry and make recommendations.  (*Id.*)

The PFM/Schaller Report ("Report") (Pltfs. RJN, Exh. F) made several important findings.  (*Id.* ¶ 26.)  First, the Report found "purchased Medallion holders are under severe financial pressure," as evidenced by medallion foreclosures, loan payments, and amounts.  (*Id.* ¶ 27.)  The Report recognized loan payments created a significant financial burden that caused Purchased medallions to be disproportionately hard-hit by the rise of TNCs.  (*Id.*)  Second, the Report found only 17 percent of medallions brought in at least $65,000 in annual revenue.  (*Id.* ¶ 28.)  By this measure, the Report found that more than three-quarters of existing medallions are "underutilized."  (*Id.*)  And finally, the Report found that taxi service at SFO was suboptimal.  The Report noted wait times in the taxi hold—a waiting area at SFO for taxis—had increased significantly, causing taxi "congestion and long wait times."  (*Id.* ¶ 29.)

## III.    2018 Taxi Reforms

Based on the Report, SFMTA's own research, and input it received from the industry after holding six taxi town hall meetings between May and September 2018, SFMTA staff submitted a number of taxi industry reforms to SFMTA Board of Directors.  (*Id.* ¶¶ 31-32.)  The Board adopted a resolution that—among other reforms—gave SFMTA's Director the authority to impose restrictions on the types of medallions authorized to pick up fares at SFO.  (*Id.* ¶ 33; Pltfs. RJN, Exh. G.)

Pursuant to this authority, on December 27, 2018, SFMTA's Director announced new regulations would go into effect on February 1, 2019, governing taxi pickups at SFO. (Toran Decl. ¶ 34; Pltfs. RJN, Exh. I.) Under these regulations, Purchased medallions can pick up fares at SFO at all times with expedited access. Post-K medallions can pick up at SFO at all times without expedited access. Corporate, Pre-K and 8000 series medallions are prohibited from making pickups at SFO. Ramp taxi medallions can pick up at SFO without expedited access, except those who meet certain wheelchair pickup incentives may obtain monthly access to the expedited line. Collectively, these regulations are the "December 2018 Regulations."[3]

The December 2018 Regulations prioritizing Purchased medallions further several of SFMTA's policy goals, and are consistent with its overall mission of protecting the environment, serving the public, and improving San Franciscans' transit experience. First, the Regulations reduce taxi congestion at SFO by decreasing incentives for taxis to park in the holding lots. (Toran Decl. ¶¶ 37-39.) SFO has four taxi holding lots, with a maximum capacity of 427 cabs. (Id. ¶ 38.) Combined with curbside space at the terminals, SFO can accommodate 476 cabs on site. (Id.) These areas are often at full capacity in off-peak hours and are more than 80 percent full for the majority of the day. (Id.) This oversupply of taxis leads to an average wait time of 1.5-2 hours during peak times, and up to 3 hours at less busy times. (Id.) When lots are full, taxis unable to enter the lots often circle waiting for a spot to open up, contributing to congestion at SFO. (Id. ¶ 39.) But at the same time, the concentration of more than a quarter of San Francisco's entire taxi fleet at the airport leaves an inadequate number of taxis to service customers in the City. (Id. ¶ 41.) Thus, the Regulations will both reduce taxi congestion at the airport and drive additional taxi service to San Francisco, where it is needed. (Id. ¶¶ 42-42.)[4]

---

[3] SFO implemented new dispatch rules consistent with these regulations. (Toran Decl. ¶ 35.) Taxis are directed to separate holding lots depending on their medallion status, and dispatched in accordance with prescribed ratios. This is contrary to Plaintiffs' unsubstantiated assertion that taxis are dispatched in ratios that are "depend[ent] on the dispatcher working at the time." (Pltfs.' MPA in support of Mot. for Prelim. Inj. ("PI Mot.") at 10.)

[4] SFO is working to develop virtual queue functionality on an app that will, among other things, manage taxi pickups at SFO. If the taxi lot has available capacity, a driver seeking to pick up a fare will be granted immediate permission to enter the staging lot. If not, the driver will be added to a virtual queue, which will provide the driver with a reserved place in line and alert the driver when his or her turn is approaching. This will allow drivers to continue to pick up fares in the City in the

In addition, the December 2018 Regulations will drive revenue to Purchased medallion holders. (*Id.* ¶¶ 45-50.)  Purchased medallion holders have been more affected by the rise of TNCs than other taxi medallion holders. (*Id.* ¶ 46.)  Their economic woes have affected not only these medallion holders but also the public generally, as foreclosures of Purchased medallions have taken these medallions out of service entirely. (*Id.* ¶¶ 49-50.)  And finally, the December 2018 Regulations aim to increase wheelchair pickups by creating an incentive program that will allow Ramp drivers who complete a certain number of wheelchair trips in San Francisco access to the expedited service line. (*Id.* ¶ 51.)

## ARGUMENT

### I.  Legal Standard

In determining whether to issue a preliminary injunction, the court considers two related factors: (1) the plaintiff's likelihood of success on the merits, and (2) the interim harm to the plaintiff if the injunction is denied, compared to the defendant's harm if the injunction is granted. (*Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 861.)

### II.  Plaintiffs Will Not Succeed On Their Claims.

"A trial court may not grant a preliminary injunction, regardless of the balance of interim harm, unless there is some possibility that the plaintiff would ultimately prevail on the merits of the claim." (*Butt v. State of Cal.* (1992) 4 Cal.4th 668, 678; see also *San Francisco Newspaper Printing Co. v. Super. Ct.* (1985) 170 Cal.App.3d 438, 442 ["[A]n injunction pendente lite must not issue unless it is reasonably probable that the moving party will prevail on the merits"].)  Here, there is no reasonable likelihood Plaintiffs will prevail on any of their claims against the City.

#### A.  The December 2018 Regulations Do Not Violate Equal Protection.

First, Plaintiffs argue SFMTA's December 2018 Regulations violate their equal protection rights because they irrationally distinguish among classes of medallion holders and arbitrarily privilege Purchased medallion holders.  Plaintiffs are incorrect—the December 2018 Regulations are rationally related to a legitimate City interest, and are thus valid.

---

meantime. (Toran Decl. ¶¶ 43-44.)  SFO previously had a plan to add this functionality to the app, but the industry strongly opposed this change. (*Id.*)

### 1.    Legal Standard

Plaintiffs acknowledge that rational basis is the applicable standard for evaluating the December 2018 Regulations.  (See PI Mot. at 13.)  This is an exceedingly deferential standard: SFMTA's regulations are "presumed valid, and this presumption is overcome only by a 'clear showing of arbitrariness and irrationality.'"  (*Kawaoka v. City of Arroyo Grande* (9th Cir. 1994) 17 F.3d 1227, 1234, quoting *Hodel v. Indiana* (1981) 452 U.S. 314, 331-332.)  SFMTA's distinctions among medallions "need only be drawn in such a manner as to bear some rational relationship to a legitimate state end."  (*Clements v. Fashing* (1982) 457 U.S. 957, 963.)  "Classifications are set aside only if they are based solely on reasons totally unrelated to the pursuit of the State's goals and only if no grounds can be conceived to justify them."  (*Id.*; see also *Warden v. State Bar* (1999) 21 Cal.4th 628, 644.)

Under rational basis review, "those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it."  (*F.C.C. v. Beach Communications, Inc.* (1993) 508 U.S. 307, 314.)  The government "has no obligation to produce evidence to sustain the rationality of a statutory classification."  (*Heller v. Doe* (1993) 509 U.S. 312, 320.)  Further, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature."  (*F.C.C.*, *supra*, at p. 315.)

### 2.    Plaintiffs Are Unlikely To Succeed On Their Equal Protection Claim.

The December 2018 Regulations comfortably satisfy this standard.  As an initial matter, the Regulations should not even trigger equal protection analysis at all.  As Plaintiffs concede, the "first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more ***similarly situated*** groups."  (PI Mot. at 12, citing *Cooley v. Super. Ct.* (2002) 29 Cal.4th 228, 253; see also *People v. Chatman* (2018) 4 Cal.5th 277, 289 ["groups at issue" must be "similarly situated in all material respects"].)  And as Plaintiffs also concede, there are significant differences between Purchased medallion holders and other medallion holders.  Purchased medallion holders generally obtained their medallions for $250,000, and given their "modest means," frequently used authorized lenders to finance the transactions.  (PI Mot. at 6; see also Toran Decl. ¶ 16.)  As a result of recent declines in the taxi industry, Purchased medallion holders have experienced "declining income" and "many have defaulted on their Credit Union loans."

(PI Mot. at 8.) Plaintiffs incorrectly argue that all taxi medallion holders "operate taxis," and ignore (1) not all medallion holders operate taxis (only 2 Corporate holders and 5 Pre-K holders have permits to drive) and (2) medallion holders have been disproportionately impacted by the change in the taxi landscape in the last few years. (Toran Decl. ¶¶ 9, 16.) Because of these differences, no further equal protection inquiry is warranted. (See *People v. Travis* (2006) 139 Cal.App.4th 1271, 1291-1292.)

But even if the December 2018 Regulations did differentiate among similarly situated groups, they would still easily satisfy equal protection requirements. Although the City's only burden is to point to a conceivable justification for the December 2018 Regulations (*Heller*, *supra*, 509 U.S. at p. 320), the actual justifications for the Regulations readily pass constitutional muster. The December 2018 Regulations serve a number of important aims: reducing taxi congestion at SFO, driving more taxi supply to San Francisco by eliminating drivers' incentives to idle at the airport, and allocating more revenue from airport trips to Purchased medallion holders, whose economic circumstances have made them particularly vulnerable to the taxi industry's recent downturn. (Toran Decl. ¶¶ 36-50.) Plaintiffs do not dispute the December 2018 Regulations could conceivably further these aims; indeed, Plaintiffs *concede* the Regulations serve precisely these interests. (PI Mot. at 15.) Indeed, Plaintiffs repeatedly emphasize one of SFMTA's motivations in enacting the December 2018 Regulations was to sustain Purchased medallion holders by prioritizing their pickups at SFO. (*Id*.)

The December 2018 Regulations and their acknowledged goals further legitimate government interests. Indeed, courts across the country have rejected equal protection challenges to taxicab industry regulations that, like the December 2018 Regulations, "foster enhanced competition within the taxicab industry . . . increase the level and quality of taxicab service available to the public for other than city airport departure trips, and . . . promote more efficient utilization of taxicabs." (*Greater Houston Small Taxicab Co. Owners Assn. v. City of Houston* (5th Cir. 2011) 660 F.3d 235, 240 [rejecting equal protection challenge to taxi permitting scheme that favored larger taxi companies]; see also *Kansas City Taxi Cab Drivers Assn. LLC v. City of Kansas City* (8th Cir. 2013) 742 F.3d 807, 810 [upholding taxi permitting scheme that favored older companies]; *Hester v. Rizzo* (E.D. La. 1978) 454 F Supp. 537, 543-544 [rejecting equal protection challenge to "two-line" system granting preferential access to certain taxi companies because the system was rationally related to the

"efficient, effective, and courteous provision of cab services to travelers deplaning at the New Orleans International Airport"].) Plaintiffs may be unhappy SFMTA has chosen to draw the line where it has—but that is not enough to state an equal protection claim. Regulators like SFMTA "must necessarily engage in a process of line-drawing." (*U.S. Railroad Retirement Bd. v. Fritz* (1980) 449 U.S. 166, 179.) This process "inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line [citation], and the fact that the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration." (*Id.*, internal quotation marks omitted.) Here, SFMTA could rationally decide, in allocating the finite resource of taxicab departures from SFO, to give Purchased medallion holders enhanced access. That decision does not offend the state or federal Constitution.

None of Plaintiffs' arguments to the contrary has merit. First, Plaintiffs rely heavily on *Merrifield v. Lockyer* (9th Cir. 2008) 547 F.3d 978, and claim the classification in this case is wholly arbitrary, like the distinctions among pesticide operators that the Ninth Circuit invalidated in that case. (PI Mot. at 14-15.) But *Merrifield* does not help Plaintiffs because it presented a unique set of facts distinguishable from those here. The classification in *Merrifield* was invalid because it was impossible to square with the interest the State asserted in defending the regulation against a simultaneous due process claim—public health concerns about exposure to pesticide. (*Merrifield*, *supra*, at p. 991.) The exemption harmed pest-control operators who were actually more at risk of exposure to pesticides. (*Id.*) The court refused to uphold the regulations in the face of this contradiction. (*Id.* ["We cannot simultaneously uphold the licensing requirement under due process based on one rationale and then uphold [plaintiff's] exclusion from the exemption based on a completely contradictory rationale"].) There are no such conflicting explanations in this case.[5]

Second, Plaintiffs suggest, again relying on *Merrifield*, that economic protectionism for the sake of it is irrational. (PI Mot. at 14.) Even if that were true—and other courts have disagreed (see,

---

[5] Plaintiffs cite two other cases, neither of which helps them. (PI Mot. at 14, fn. 3.) *St. Joseph Abbey v. Castille* (5th Cir. 2013) 712 F.3d 215, 223, specifically found taxicab regulations favoring one taxicab company over another were valid, and not similar to the casket sale law the court invalidated in that case. Plaintiffs' reliance on *Allied Concrete & Supply Co. v. Brown* (C.D. Cal. 2016) 2016 WL 9275783, is even more improper—the Ninth Circuit **reversed** the injunction issued in that case, and found the distinctions at issue among delivery drivers to be valid. (*Allied Concrete & Supply Co. v. Baker* (9th Cir. 2018) 904 F.3d 1053, 1059-1061.)

e.g., *Sensational Smiles, LLC v. Mullen* (2d Cir. 2015) 793 F.3d 281, 286 ["Economic favoritism is rational for purposes of our review of state action under the Fourteenth Amendment"]; *Powers v. Harris* (10th Cir. 2004) 379 F.3d 1208, 1221 [similar])—the City is not engaging in bare economic favoritism.  The December 2018 Regulations give priority to Purchased medallion holders in light of their significantly increased overhead, the comparatively little time they have had to realize value from their medallions, and the precarious financial position their outstanding loan balances create.  (Toran Decl. ¶¶ 46-50.)  And the December 2018 Regulations do not only support Purchased medallion holders.  They also have additional goals: reducing taxi congestion at SFO and managing the taxi supply. (*Id.* ¶¶ 37-44.)

Third, Plaintiffs complain "there is no evidence" the Regulations have already accomplished their goals. (PI Mot. at 15.)  But this doesn't matter.  Courts "must" not inquire into a law's practical effectiveness.  (*Heller*, *supra*, 509 U.S. at p. 319.)  Nor must the rationale—let alone the actual effects—of the Regulations be "empirically substantiated."  (*People v. Turnage* (2012) 55 Cal.4th 62, 75.)  The City is not obligated to produce the "evidence" Plaintiffs want; rather, it is Plaintiffs, not the City, who have the burden of "negat[ing] every possible, plausible grounds for the disputed disparity." (*Id.*)  They have not come close to doing so.

Finally, Plaintiffs assert the December 2018 Regulations impermissibly aim to reduce the City's liability in litigation with the San Francisco Federal Credit Union.  (PI Mot. at 15.)  Plaintiffs appear to suggest this is an improper motive which makes the Regulations unconstitutional.  But they are wrong for several reasons.  For one thing, Plaintiffs do not identify any evidence showing the Credit Union lawsuit has anything to do with the Regulations.  For another, SFMTA's true motivations are "entirely irrelevant."  (*F.C.C.*, *supra*, 508 U.S. at p. 314.)  And regardless, the Regulations would be no less constitutional even if the City were motivated by liability concerns.  Protecting the public fisc is a legitimate public interest.  (*Moreno v. Draper* (1999) 70 Cal.App.4th 886, 897.)

### B.    Plaintiffs Are Unlikely To Show The City Violated CEQA.

In their CEQA claim, Plaintiffs challenge SFMTA's determination the December 2018 Regulations were "not a project."  Plaintiffs assert CEQA required further environmental review

because the new taxi pick-up rules will lead to additional vehicles "deadheading" to and from SFO and may cause a significant impact on air quality.

CEQA and the CEQA Guidelines establish a three-tier process to ensure public agencies inform their decisions with environmental considerations. (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 74.) The first tier is jurisdictional, requiring an agency to conduct a preliminary review to determine whether an activity is subject to CEQA. (Cal. Code Regs., tit. 14 ("Guidelines"), § 15060; see Pub. R. Code § 21065; *Muzzy Ranch Co. v. Solano County Airport Land Use Comm'n* (2007) 41 Cal.4th 372, 380.)

CEQA broadly defines a "project" as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment." (Pub. R. Code § 21065.) A "project" means "the whole of an action." (Guidelines, § 15378(a)(1).) "[A] physical change is identified by comparing *existing* physical conditions with the physical conditions that are predicted to exist at a later point in time, after the proposed activity has been implemented. The difference between these two sets of physical conditions is the relevant physical change." (*Wal-Mart Stores, Inc. v. City of Turlock* (2006) 138 Cal.App.4th 273, 289, emphasis in original, citation & footnote omitted.)

An activity that is not a "project" is not subject to further review under CEQA. (Guidelines, § 15060(c); *Muzzy Ranch Co.*, *supra*, 41 Cal.4th pp. 379-80.) Because the Regulations will not result in "a direct or reasonably foreseeable indirect physical change in the environment" (Guidelines, §§ 15060(c)(2); 15378, 15382), SFMTA correctly determined they were not a "project" under CEQA.

### 1. Legal Standard

"Whether a particular activity constitutes a project" subject to CEQA review "is a question of law." (*CREED–21 v. City of San Diego* (2015) 234 Cal.App.4th 488, 503; see *Rominger v. County of Colusa* (2014) 229 Cal.App.4th 690, 701–702.)

### 2. Plaintiffs Did Not Exhaust Their CEQA Claim.

A CEQA plaintiff bears the burden of demonstrating exhaustion of administrative remedies. (*Bridges v. Mt. San Jacinto Community College Dist.* (2017) 14 Cal.App.5th 104, 116; *Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 526.) CEQA imposes two distinct and separate

administrative exhaustion requirements on a plaintiff. Both of these exhaustion requirements must be satisfied. First, the alleged grounds of noncompliance with CEQA must be presented to the public agency orally or in writing *by any person* before the close of the public hearing on the project. (Pub. R. Code § 21177(a).) Second, *the plaintiff* must have objected to the approval of the project orally or in writing before the close of the public hearing on the project. (*Id.* § 21177(b).) CEQA's exhaustion requirements are excused if the agency had no public hearing, or if the agency "failed to give the notice required by law." (*Id.* § 21177(e).)

Both Plaintiffs' complaint and their preliminary injunction papers are silent as to any action to comply with either of CEQA's two exhaustion requirements. Plaintiffs nowhere assert any person raised before SFMTA the alleged CEQA deficiency they now assert in this lawsuit. Likewise, Plaintiffs nowhere assert they objected to the project before SFMTA. Nor do Plaintiffs suggest any legal deficiency in SFMTA's public notice of the October 16, 2018 SFMTA Board meeting adopting the December 2018 Regulations they now complain about. SFMTA Board's October 16, 2018 meeting satisfies section 21177(e)'s requirement for a "public hearing or other opportunity for members of the public to raise [ ] objections orally or in writing prior to the approval of the project." (*Bridges*, *supra*, 14 Cal.App.5th at p. 117; *Mani Brothers Real Estate Group v. City of Los Angeles* (2007) 153 Cal.App.4th 1385, 1395.)

In the absence of any evidence, much less an allegation, of compliance with CEQA's exhaustion requirements, Plaintiffs fail to meet their burden of proof. For this reason alone, Plaintiffs are not likely to succeed on their CEQA claim.

### 3.    SFMTA Properly Determined The Regulations Are Not a "Project."

In *Union of Medical Marijuana Patients, Inc. v. City of Upland* (2016) 245 Cal.App.4th 1265, 1275-76) the city of Upland had determined its ordinance prohibiting mobile marijuana dispensaries was "not a project" under CEQA. Plaintiffs challenged that determination, asserting the ban on mobile dispensaries would cause residents to travel further for their supplies, and residents would create hundreds of "home cultivation sites," resulting in increased electric and water consumption, and increased plant waste. The court rejected this challenge to Upland's "no project" determination, because it was based impermissibly on speculation. "Common sense leads us to conclude these

concerns are too 'speculative or unlikely' to be considered 'reasonably foreseeable.'" (*Id.* at p. 1276, quoting Guidelines, § 15064(d)(3).)

Similarly, in *Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2016) 4 Cal.App.5th 103, *review granted* 386 P.3d 795 (Jan. 11, 2017), the city of San Diego had determined its ordinance limiting the locations of medical marijuana dispensaries was "not a project." Plaintiffs asserted restricting dispensary locations would cause foreseeable environmental impacts, namely: (1) traffic and air quality impacts from increased driving; (2) increased home cultivation leading to increased electricity consumption; and (3) increased construction for new facilities. The court rejected these possible impacts as speculative, based on unwarranted assumptions that new legal dispensaries under the ordinance would be fewer than the existing illegal dispensaries and in inconvenient locations, and that new legal dispensaries would construct new facilities rather than occupy existing retail space. The court upheld San Diego's "no project" determination. (*Id.* at pp. 119-23.)

In this case, Plaintiffs' asserted impacts are likewise unduly speculative, based on unwarranted assumptions. Plaintiffs simultaneously complain the new rules will cause Pre-K and Post-K medallion holders to retire their medallions, and at the same time will cause those same medallion holders to "deadhead" repeatedly from SFO often enough to cause significant air quality impacts. (PI Mot. at 11, 16-17.) Plaintiffs fail to acknowledge San Francisco's taxi fleet is a "clean vehicle" fleet. (Toran Decl. ¶ 52.) Only four of the 253 Pre-K and Corporate medallions are traditional internal combustion gasoline-powered vehicles. (*Id.*) The balance of the Pre-K fleet are hybrid and clean CNG vehicles, which have minimal emissions on the freeway. (*Id.*) Since February 1, the four conventional Pre-K taxis have recorded only 83 trips to SFO—less than 1.5 trips per day. (*Id.*) Because Plaintiffs' asserted impacts are speculative, and internally contradictory, the court should reject them and uphold SFMTA's "no project" determination.

### C. Plaintiffs Are Not Likely To Succeed On Their Age Discrimination Claim.

Plaintiffs also perfunctorily assert the December 2018 Regulations discriminate on the basis of age in violation of Government Code Section 11135(a). (PI Mot. at 17-18.) But Plaintiffs are unlikely to succeed on this claim. Section 11135 requires a showing of discrimination in "full and equal access to the benefits of . . . any program or activity that is . . . funded directly by the state." Plaintiffs

identify the Paratransit Program, which provides access to transit services for people unable to use public transit because of a disability or health condition. (Toran Decl. ¶ 53.) But as Plaintiffs admit, they are not among the class of persons entitled to access or benefit from the Paratransit Program— rather, "persons who are disabled or have a disabling health condition" are "the intended beneficiaries of the program." (PI Mot. at 18.) To the extent Plaintiffs claim the December 2018 Regulations discriminate against them on the basis of age, those alleged impacts do not fall on Plaintiffs in their capacity as beneficiaries of a state-funded program or activity. (*Comunidad en Accion v. Los Angeles City Council* (2013) 219 Cal.App.4th 1116, 1126 [granting summary adjudication to City on section 11135 claim where allegedly discriminatory decisions were not made in connection with a state-funded program or activity].) And to the extent Plaintiffs assert injuries to Paratransit beneficiaries, they lack standing to do so. (*Blumhorst v. Jewish Family Services of Los Angeles* (2005) 126 Cal.App.4th 993, 1002-1003 [plaintiff in section 11135 action must allege personal injury].)

In any case, Plaintiffs are wrong to argue the December 2018 Regulations will reduce the availability of taxis under the Paratransit Program. Plaintiffs cite no evidence supporting this assertion. (PI Mot. at 18.) To the contrary, the December 2018 Regulations include a Ramp taxi incentive program that gives Ramp drivers access to the expedited line at SFO if they complete a certain number of Paratransit trips in the Paratransit service area. (Toran Decl. ¶ 51.) The Regulations will enhance, not diminish, Paratransit services in the City.

## III. The Balance of Hardships Favors The City.

Even if Plaintiffs could show a likelihood of success on the merits, they would still need to demonstrate the balance of harms weighs in their favor. (*White v. Davis* (2003) 30 Cal.4th 528, 554.) But even accepting Plaintiffs' own conception of harm, they cannot make this showing. Plaintiffs assert economic harm to Pre-K and Post-K medallion holders. And they acknowledge the purpose of the December 2018 Regulations was to provide relief to Purchased medallion holders. (PI Mot. at 15.). The December 2018 Regulations reallocate a particular resource—revenue opportunities from taxi trips originating at SFO—preferentially to Purchased medallion holders. An injunction would deprive Purchased medallion holders of this benefit. It follows that dollar for dollar, the balance of hardships falls equally on each side—it does not tip in Plaintiffs' favor.

Several additional factors militate against preliminary relief.  One is the presumption that the public officers and agencies performing their official duties further the public interest.  Where, as here, "defendants are attempting to perform their legal duties . . . provisional injunctive relief which would deter or delay defendants in the performance of their duties would necessarily entail a significant risk of harm to the public interest."  (*Tahoe Keys Property Owners' Assn. v. State Water Resources Control Bd.* (1994) 23 Cal.App.4th 1249, 1473-1474.)  That is particularly true in this case, where SFMTA has made the choice to enact a policy that will help a vulnerable economic group; every day SFMTA's chosen policy does not go into effect will further disadvantage that group.  In these circumstances, a plaintiff must "make a significant showing of irreparable injury" to warrant preliminary injunctive relief.  (*Id.* at p. 1471.)  Plaintiffs have not done so.

Finally, delay in moving for a preliminary injunction must be considered in determining whether a claimed injury is irreparable.  (*O'Connell v. Super. Ct.* (2006) 141 Cal.App.4th 1452, 1481.)  SFMTA authorized the challenged SFO pick-up restrictions in October 2018 and published the detailed regulations in December 2018.  But Plaintiffs did not challenge them at that time, or any time shortly thereafter.  Instead, they waited to file this lawsuit until mid-March 2019, and do not explain the need for sudden urgency.  This inexplicable delay counsels against a preliminary injunction here.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction should be denied.

Dated: May 15, 2019

DENNIS J. HERRERA
City Attorney
AILEEN M. MCGRATH
JAMES M. EMERY
Deputy City Attorneys

*/s/ Aileen M. McGrath*
By:_____
AILEEN M. MCGRATH

Attorneys for Defendants
CITY AND COUNTY OF SAN FRANCISCO
SAN FRANCISCO MUNICIPAL TRANSIT AGENCY
EDWARD D. REISKIN, DIRECTOR OF
TRANSPORTATION