HASSARD BONNINGTON LLP
Philip S. Ward (#51768)
psw@hassard.com
Warren R. Webster (#209540)
wrw@hassard.com
275 Battery Street, Suite 1600
San Francisco, California 94111-3370
Telephone: (415) 288-9800
Fax: (415) 288-9801

KENNETH A. BRUNETTI (156164)
kbrunetti@brlawsf.com
GREGORY A. ROUGEAU (194437)
grougeau@brlawsf.com
BRUNETTI ROUGEAU LLP
235 Montgomery Street, Ste. 410
San Francisco, CA 94104
Telephone: (415) 992-8943
Fax: (415) 992-8915

Attorneys for Plaintiffs
SAN FRANCISCO TAXI COALITION, *et al.*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN FRANCISCO TAXI COALITION, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO, et al.,<br><br>Defendants. | No. 19-01972-WHA<br><br>**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date: May 30, 2019<br>Time: 8:00 a.m.<br>Dept.: Courtroom 12 – 19th Floor<br>450 Golden Gate Ave.<br>San Francisco, CA 94102<br><br>Trial Date: None Assigned |

## SUMMARY AND OVERVIEW

The City admits, repeatedly, throughout its opposition, that its primary motive in passing December 2018 regulations was to provide an economic advantage to Purchased medallion holders, who, according to the City, have suffered the most by the decline in the taxi business because they still have loans to pay off. On page 6 of its Opposition ("Opp."), the City

-1-
PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

states, "In addition, the 2018 Regulations will drive revenue to Purchased medallion holders. . . Purchased medallion holders have been more affected by the rise of TNCs than other taxi medallion holders." The City suggests that it has a valid reason to help out Purchased medallion holders because they have not had the same opportunity to realize the returns enjoyed by holders of the Pre-K and Post-K medallions, many who have held their medallions for decades. Opp. at 2. But the City is not in the investment business and helping to ensure that a particular class of medallion holders earns a certain return is not the City's business and is not rationally related to a legitimate government purpose. This is precisely the type of action that is irrational as matter of law and therefore cannot even survive deferential "rational basis" scrutiny. The 2018 regulations therefore must be stricken and a matter of law. *Merrifield v. Lockyer*, 547 F.3d 978, 991 and n.15 (2008).

Even though the City names other reasons and rationales behind its new regulations on their face these "policy goals" are nonsensical and are not rationally related to a legitimate government purpose. First, the City states that one of its goals is to reduce congestion at SFO. Opp. at 5. This makes no sense because the number of pre-K and corporate medallion holders that are being denied access to SFO (253) is far less than the number of Post-K medallions (559) and Purchased medallions (625), which are allowed to pick up passengers at SFO. Opp. at 2. If anything, there is likely to be an increase in congestion at SFO because the City is incentivizing Purchased medallion holders – which far outnumber Pre-K and corporate medallion holders – to go to the airport, even without passengers, since they are given such high priority treatment.

Second, the City argues that there will be an increase in the number of taxis serving the City because pre-K and corporate medallion holders can no longer pick up fares at the airport. Again, that is also irrational. The City's policies are having the opposite as taxis are being taken out of service. Through their multiple declarations, Plaintiffs have shown that the number of taxis operating in the City are declining in number and this effect should have been an obvious to the SFMTA. The color schemes are no longer interested in leasing pre-K and corporate (and even post-K medallions) because the drivers do not want to drive any car without a Purchased

PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

medallion. Taxis literally are parked in cab company lots going unused. The number of taxis operating in the City is declining, not increasing.

The Third rationale is the City's real motivation for passing the 2018 Regulations – to "drive revenue to Purchased Medallion holders." Opp. at 6. Toran Decl., ¶¶ 45-50. It is no coincidence that the City passed the 2018 Regulations the same year the Credit Union sued the City. The City is clearly attempting to reduce the amount of its exposure to the Credit Union by propping up the value of the Purchased Medallions, to the detriment of the other medallion holders and the taxi industry generally. This is nothing more than a "naked attempt to raise a fortress protecting [one subsection of an industry at the expense of another similarly situated]" group. *Craigmiles v. Giles*, 312 F.3d 220, 229 (6th Cir. 2002).[1]

With respect to Plaintiffs' CEQA claim, the City argues that Plaintiffs did not exhaust its administrative remedies, citing Public Resources Code (PRC) §21177. That is untrue. Both requirements of §21177(a) and (b) were satisfied. Members of the Coalition presented their concerns about traffic, environmental impacts and the necessity of a CEQA review both at a public hearing held before the SFMTA on September 18, 2018, as well as at the October 16, 2018 board meeting where the SFMTA board passed the 2018 Regulations. Moreover, even though the Board of Appeals apparently lacks jurisdiction to hear appeals from SFMTA actions, Plaintiffs attempted to appeal the City's December 27 directive (via Ed Reiskin's Memorandum) but were rejected. Request for Judicial Notice in Support of Reply Brief ("RJN II"), Ex. B. Plaintiffs certainly exhausted their administrative remedies before filing this CEQA action.

The City also argues that Plaintiffs' assertion of potential environmental effects of the new regulations is merely speculative and therefore must be rejected. Unlike the cases cited by the City, however, where the claims of increased traffic really were speculative and not reasonably foreseeable, here the threat of increased traffic is real. With high priority access

---

[1] The City also claims that it aims to increase wheelchair pickups with an incentive program for Ramp drivers. Plaintiffs do not contest this part of the Regulations, only the aspect in which Pre-k and corporate medallion holders are prohibited from picking up fares at SFO as well as the new rules giving priority pick-up access to Purchased medallion holders.

PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

being offered to taxis carrying Purchased medallions, and the significantly higher fares drivers can earn from trips from the airport, drivers using Purchased medallions will be highly incentivized to drive to SF for a pick-up even if they do not have a passenger. Similarly, drivers using Pre-K medallions (to the extent there are any left) who do take passengers to the airport will have to return to the City without a passenger. The net effect is that there will be many more taxis driving to and from the airport without passengers, whereas in the past these rides had passengers both ways. The bottom line is that there will be more taxis on the roads to and from the City, which will undoubtedly have an effect on the environment.

The City also argues that Plaintiffs are unlikely to succeed on their age discrimination claim because they are not the targeted beneficiaries of the Paratransit program. This argument misses the point. The statute is clear. It provides that no person shall discriminate on the basis of age, under any program that receives state funding. The program is the City's taxi system and within that system the City operates the Paratransit program, which unquestionably receives state funding. Under the City's new rules for its taxi system, the City is now denying holders of Pre-K medallions (almost all of whom are in their 70s or older) access to the Airport which necessarily includes rides under the Paratransit program. In other words, while the Paratransit program certainly is intended to assist the disabled or elderly, the bottom line is that the City's taxi program is receiving state funding and the City is discriminating against older drivers. This is a violation of Government Code section 11135.

The City further argues that the balance of hardships does not favor the City, remarkably, because if an injunction is issued it will deprive the Purchased medallion holders of the planned "reallocation" of "revenue opportunities" from SFO passenger pick-ups. It then says, "It follows that dollar for dollar, the balance of hardships falls equally – it does not tip in Plaintiffs' favor." The City is applying the wrong standard. The comparison of hardships should be a comparison of hardships Plaintiffs will suffer if an injunction is issued versus the hardship the City (as the defendant) will suffer if an injunction is not issued. *IT Corp. v. County of Imperial*, 35 Cal.3d 63, 69-70 (1983).

Moreover, even though it's the wrong comparison, there is absolutely no support for the

PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

notion that if Purchased medallion holders are denied favorable treatment, they will suffer the same harm, "dollar for dollar" that Plaintiffs will suffer if the regulations are not enjoined. The harm that Plaintiffs will suffer is severe, and it's not just the Pre-K medallion holders. It includes Post-K medallion holders, drivers and the taxi companies, all of who will suffer, as well as the general public as the taxi industry collapses. The number of taxicabs operating in San Francisco as a result of these changes is rapidly declining, thereby hurting the public. Taxicab companies are being harmed because they are unable to get drivers to drive their taxis unless they are carrying a Purchased medallion and, as a result the companies are parking many of their cars which are not carrying Purchased medallions, resulting in declining revenues for the companies. The owners of some of these companies believe they will have to shut down, which result in even fewer taxis on the streets. Drivers are suffering because they cannot make enough money without a Purchased medallion, and there are not enough Purchased medallions to go around for all of the remaining drivers. The medallion holders are suffering because they are losing income they used to receive from leasing out their Pre-K and Post-K medallions to the color schemes.

If an injunction is not issued, the harm the City will suffer will be far less severe. Things will simply go back to the status quo that existed prior to February 1, 2019. All taxicabs will be able to pick up passengers as SFO and there will not be a rapid decline in the number of taxis driving in the City.

Finally, the City argues that the Plaintiffs' delay in filing the lawsuit somehow weighs against the issuance of an injunction. To put this into perspective the rules were not put into place until December 27, 2018 when Director Edward Reiskin issued his memo to the taxicab industry. The rules did not go into effect until February 1. The Coalition attempted to appeal the new regulations and did not receive a final rejection from the Board of Appeals until January 29, 2019. Plaintiffs filed their lawsuit on March 21, 2019. Given that the Plaintiffs had to form the Coalition, raise capital to fund the lawsuit, find attorneys to draft the lawsuit and motion papers, and given the complex factual background and substantial factual record, the short delay in filing the lawsuit and motion was more than reasonable.

# ARGUMENT

## I. THERE IS A REASONABLE PROBABILITY THAT PLAINTIFFS WILL PREVAIL ON THEIR EQUAL PROTECTION CLAIMS.

The City argues that Plaintiffs cannot prevail on its equal protection claims because the different categories of taxi medallion holders are not *similarly situated* in "all material respects." Opp. at 7. This argument falls flat. Prior to the implementation of the new regulations on February 1, 2019, the medallion holders had exactly the same rights in all *material* respects. While there were driving requirements imposed on Post-K medallion holders which were not imposed on other medallion holders, that is not material. All medallion holders were able to lease out their medallions to the color schemes. Taxis driving with all categories of medallions could pick up passengers anywhere in the City and at the airport. The color schemes did not distinguish between what type of medallion they were leasing because they all had the same pick-up and driving rights and privileges. Everything changed when the City imposed its new rules, which drastically changed the playing field, essentially destroyed the value of the Pre-K medallions, greatly diminished the value of the Post-K medallions, and harmed the drivers and taxi companies, all to benefit of the Purchased Medallion holders.

### A. The City's 2018 Reforms Are Not Rationally Related to a Legitimate Government Interest.

"Rational basis review, while deferential, is not 'toothless.'" *People's Rights Organization, Inc. v. City of Columbus*, 152 F.3d 522, 532 (6th Cir. 1998). "[E]ven in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be obtained. The search for the link between classification and objective gives Substance to the Equal Protection Clause." *Romer v. Evans*, 517 U.S. 620, 632 (1996). Here, it is clear that the SFMTA's main motivation in passing the 2018 reforms was to benefit the Purchased medallion holders. The City points this out repeatedly in its brief and in Ms. Toran's declaration. See Opp. at 3 (discussing how Purchased medallion holders had to pay $250,000 to buy the medallions, owe

PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

typically at least $200,000 and have to make loan payments of $1,500 to $2,000 per month); Opp. at 6 (the 2018 Regulations "will drive revenue to the Purchased medallion holders."); Opp. at 15("SFMTA has made a choice to enact a policy that will help a vulnerable economic group"); Toran Decl., ¶¶ 45-50.

The SFMTA's stated purpose[2] for passing the 2018 reforms do not survive even the deferential rational basis test because they are clearly designed to provide an economic advantage to one particular group to the detriment of other similarly situated groups. "Courts have repeatedly recognized that protecting a discrete interest group from economic competition is not a legitimate governmental purpose." *Craigmiles v. Giles*, 312 F.3d. 220, 224 (6th Cir. 2002). Other courts have also adopted the rule that "mere economic protectionism for the same of economic protectionism is irrational with respect to determining if a classification survives rational basis." *Merrifield*, *supra*, 547 F.3d at 991 n. 15; *Joseph Abbey v. Castille*, 712 F.3d 215, 222-223 (5th Cir. 2013) ("As we see it, neither precedent nor broader principles suggest that mere economic protection of a particular industry is a legitimate governmental purpose." The City has admitted that its goal was to "reallocate" money to the Purchased medallion holders. Opp. at 14. This is akin to "a naked transfer of wealth," which is not a legitimate government purpose. *Joseph Abbey*, 712 F.3d at 223. The SFMTA's 2018 rule changes therefore violate Plaintiffs' equal protection rights.[3]

The City cites to other cases involving taxicab regulations to support its case, but those cases are distinguishable. In *Greater Houston Small Taxicab Co. Owners Ass'n v. City of Houston*, 660 F.3d 235 (5th Cir. 2011), an association representing small taxicab companies

---

[2] As explained in the overview above, the City's other stated reasons for passing the new rules are pretextual. The new rules will not decrease congestion at SFO but are likely to increase congestion as more taxis using Purchased medallions will be highly incentivized to deadhead to the airport even without passengers, given the high priority afforded them for passenger pick-ups. Also, as more Pre-K and Post-K medallions are put out of use, and taxi companies are parking an increasing number of their taxis, the number of taxis operating in the City is declining, not increasing. Also, Plaintiffs do not object to the changes to the Ramp fleet.

[3] Plaintiffs recognize that the Tenth Circuit and Second Circuit disagree with the *Merrifield*, *Cragmiles* and *Joseph Abbey* rulings. *Sensational Smiles, LLC v. Mullen*, 793 F.3d 281, 286 (2nd Cir. 2015); *Powers v. Harris*, 379 F.3d 1208, 1221. Plaintiffs believe however that the holdings that laws designed solely to benefit a particular group economically are irrational as a matter of law are the sounder approach.

PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

sued the city on equal protection grounds, claiming that regulations authorizing the issuance of new permits unfairly gave priority to larger taxi companies. Plaintiffs also argued that the scheme was based on economic favoritism and was not fair to the smaller taxi companies. *Id.* at 239. The city argued that its priority scheme was based on legitimate goals of fostering competition, increasing the level and quality of taxi service in the city. The Court agreed with the city, finding that the larger taxi companies were more likely to offer a broader range of services that better served customers. "[T]here is no real dispute that promoting full-service taxi operations is a legitimate government purpose under the rational basis test." *Id.* at 240.

In *Kansas City Taxi Cab Drivers Ass'n, LLC v City of Kansas City Mo.*, 742 F.3d 807 (8th Cir. 2013), a coalition of taxicab drivers sued the city to overturn an ordinance that imposed a reduction in the overall taxi permits in the city and imposed a requirement that new applicants must apply for a minimum of 10 permits. The coalition claimed the minimum requirement of 10 permits for new applicants constituted disparate treatment of new taxi companies that were attempting to get into the market. While the city's stated purpose for the new ordinance was "insufficient demand for taxicabs," the court identified other purposes: "creating incentives to invest in infrastructure and increasing quality in the taxicab industry . . . Existing firms may invest knowing the number of permits they will hold in the future." *Id.* at 809.

In both *City of Houston* and *City of Kansas City* the cities had legitimate government purposes, namely ensuring the quality of the taxicab industry, providing better quality service and encouraging investment in infrastructure, all of which was beneficial to the public. Here, in contrast we do not have the same issues. In San Francisco the color schemes lease medallions, largely from individual holders. There is no issue with the quality of the service provided by the color schemes nor is the City in any way trying to increase the quality of taxi service. Rather, the City is simply giving an economic advantage to Purchased medallion holders as a way of increasing the value of these medallions and reducing the City's exposure to the Credit Union. As discussed above, the City is actually reducing customer service to the public by causing the

PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

number of taxis operating in the City to decline.[4]

### B. Plaintiffs Are Likely to Prevail on their CEQA Violation Claims.

#### 1. Plaintiffs Have Exhausted Their Administrative Remedies.

The City first argues that Plaintiffs have not exhausted their administrative remedies by satisfying the requirements of Public Resources Code (PRC) section 21177. This is simply not true and somewhat surprising given the contentious nature, length, number of speakers and publicity received about the October 16 public hearing on the subject of the proposed rule changes. Plaintiffs satisfied PRC §21177(a) when Robert Chesana, a board member of the Medallion Holders Association (which is a member of the San Francisco Taxi Coalition) spoke at a SFMTA board meeting on September 18, 2018. RJN II, at 2, ¶1. Plaintiffs easily satisfied PRC §21177(b) when many members of the coalition spoke out against the rule changes at the October 16, 2018 SFMTA Board meeting. RJN II, ¶; Ex. A at 16-17. At least 79 members of the public, including many coalition members spoke out in opposition to the rule changes. In short, the exhaustion requirements of PRC §21177 have easily been satisfied.

#### 2. The SFMTA Staff's Conclusion that the Regulations Are Not a "Project" Was Wrong.

"Ordinances passed by cities are clearly activities undertaken by a public agency and thus *potential* 'projects' under CEQA." *Union of Medical Marijuana Patients, Inc. v. City of San Diego*, 4 Cal.App.5th 103 (2016). Yet, the SFMTA staff never conducted a preliminary review to determine whether its proposed rule changes were a "project" requiring CEQA review, as it was required to do. 14 Calif. Code Regs. (CCR) §15060(c). Instead, staff made a cursory conclusion that the rule changes were not a "project" without undergoing any study to

---

[4] In *Hester v. Rizzo*, 454 F.Supp. 537 (E.D. La. 1978) the court upheld a two-line system for passengers at the New Orleans International Airport, including a short-haul line for passengers going short distances in certain jurisdictions and a separate line for passengers going long distances beyond the bounds of the short-haul jurisdictions. The court there understandably held there that there was a legitimate government interest in having and organized and streamline system and to avoid conflicts between short-haul passengers and drivers wishing to get long-haul fares. It should be noted that the taxis operating at the airport were given permits by multiple jurisdictions. The issues in that case are completely different from the facts in this case where all of the medallions issued are under the jurisdiction of the SFMTA and there is no issue with multiple lines distinguished by the particular jurisdiction that issued a taxi permit.

PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

determine the effects on traffic, congestion air pollution, etc. RJN Ex. J. CCR

Section 15378 defines a "project" as "the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment. It is difficult to understand how staff could arbitrarily conclude its rule changes would not have some impact on traffic, which is a "reasonably foreseeable indirect physical change in the environment." The 2018 regulations will almost certainly have an impact on traffic between the City and SFO and elsewhere in the surrounding areas, as taxis with Purchased medallions are likely to drive to the airport without passengers just to take advantage of the priority pick-up line. At the same time, taxis with pre-K and post-K medallions are likely to rush back to the City after dropping off passengers at SFO, empty-handed, because they either are not allowed pick-ups or do not want to wait hours for an available pickup from the secondary lot. The SFMTA should have conducted an analysis of the possible environmental effects of the new rules. In failing to do so the SFMTA failed to meet the first tier of for determining whether an activity is in compliance with CEQA. 14 CCR § 15060(c); *Muzzy Ranch*, 41 Cal.4th at 380.

The cases cited by the City do not support its position that no further CEQA analysis was required. In *Union of Medical Marijuana Patients, Inc. v. City of Upland*, 245 Cal.App.4th 1265, 1275-76 (2016), the Court rejected the plaintiffs' CEQA challenge of an ordinance ban on mobile marijuana dispensaries because the plaintiffs' based their challenge on "layers of assumptions" about the number of medical marijuana patients in the city, marijuana usage rates, how many patients would drive to get the product, how many would cultivate their own and other unsupported assumptions. In short, the challenge was based on pure speculation. In *City of San Diego*, *supra*, the Court rejected a similar challenge to the City of San Diego's medical marijuana ordinance on the grounds that the challenge was based "on a fundamental assumption that is unsupported by the evidence and is unduly speculative." 4 Cal.App.5th at 12-21.

Here, in stark contrast, Plaintiffs' claims are not based on speculation. The City has changed the rules so that taxis with Pre-K or corporate medallions cannot pick-up passengers from SFO, meaning if they get fares to the airport they will have to return to the City without

PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

passengers. Taxis holding Purchased medallions will be incentivized to go to SFO even without passengers in order to take advantage of the priority line and get the more lucrative fares. The bottom line is that there is going go be an increase in taxis without passengers driving too and from the airport. This is not speculative. It's a virtual certainty for obvious financial reasons.

### 3. Plaintiffs Are Likely to Prevail on their Age Discrimination Claim.

As discussed in the Summary and Overview above it is not necessary that the Pre-K medallion holders are the intended beneficiaries of the City's Paratransit program. The point is that the City receives state funding for its Paratransit program, which is part of the City's taxi program. Cal. Gov't Code §11135(a) provides that no person "shall, on the basis of . . . age . . . be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is . . . funded directly by the state or receives financial assistance from the state." The City's taxi licensing scheme is a "program or activity" that receives some funding from the State (for its Paratransit component). The City does not dispute that the 2018 regulations discriminate against holders of Pre-K medallions, whose average age is 76 and who are almost all in their seventies or older. In denying pre-K medallion holders the right to pick up passengers at SFO, the SFMTA is denying them "full and equal access to the City's taxing licensing program, which receives money from the State. This is a violation of Gov't Code §11135(a).

Dated: May 15, 2019                                         BRUNETTI ROUGEAU LLP


By:  */s/ Kenneth A. Brunetti*
Kenneth A. Brunetti
Attorneys for Plaintiffs
SAN FRANCISCO TAXI
COALITION, *et al*.