1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO TAXI COALITION,
PATRICK O'SULLIVAN, SAI LEE,
GEORGE HORBAL, ALLIANCE CAB and
S.F. TOWN TAXI INC.,

           Plaintiffs,

  v.

CITY AND COUNTY OF SAN FRANCISCO;
SAN FRANCISCO MUNICIPAL TRANSIT
AGENCY; EDWARD D. REISKIN, Director
of Transportation; and DOES 1 through 20,

           Defendants.

          No. C 19-01972  WHA

**ORDER DENYING
PRELIMINARY INJUNCTION**

**INTRODUCTION**

     In this action, taxi medallion holders move to preliminarily enjoin the City of San

Francisco from implementing a newly promulgated rule.  This rule would restrict certain

categories of taxi medallion holders from picking up fares at San Francisco International

Airport.  The preliminary injunction is **DENIED**.

**STATEMENT**

    **1.**    **TAXI MEDALLIONS.**

     The San Francisco Municipal Transit Agency issues permits to individuals, joint tenants,

or businesses to operate particular taxis in the City and County of San Francisco.  These

1   permits, called taxi medallions, remain the property of the city.  Fewer than 1500 medallions

2   operate throughout San Francisco (Dkt. No. 26 ¶¶ 8–9).

3       These medallions can be divided into three general categories.  *First*, medallions issued

4   before 1978.  *Second*, medallions issued between 1978 and 2010.  *Third*, medallions issued after

5   2010.  253 medallions remain in the first category, 559 in the second category, and 625 in the

6   third (*id*. ¶ 9.a–d).[1]

7       The medallions issued pre-1978 had few limitations.  They could be held by both

8   companies and individuals, one holder could hold more than one medallion, the medallions

9   could be transferred, and the medallion holders had no obligation to drive a minimum number

10  of annual miles.  One corporation currently holds 16 medallions.  The City of San Francisco

11  issued these pre-1978 medallions for thousands of dollars (*id*. ¶¶ 9.a–b, 13–14).[2]

12      In 1978, Proposition K regulated the taxi industry.  Among other reforms, Proposition K

13  eliminated corporate-held medallions, limited individuals to one medallion each, and required

14  these individuals to drive full time (800 hours/year or 156 four-hour shifts/year).  These rules

15  did not apply retroactively.  In addition, post-1978 medallions could only be sold if the

16  medallion holder was at least 60 years old or had a permanent disability.  In stark contrast to the

17  pre-1978 class of medallion holders, post-1978 medallion-holders paid $200 for their

18  medallions (*id*. ¶¶ 9.c, 15).

19      In 2010, the San Francisco Municipal Transit Agency began selling medallions for

20  $250,000.  Most of these medallions had been purchased from permanently disabled taxi drivers

21  or taxi drivers over the age of 60.  The Transit Agency paid these drivers $200,000 to surrender

22  their medallions, keeping the remainder.  The Transit Agency generated $63 million in revenue

23  from these medallion sales (*id*. ¶¶ 9.c, 18, 19).

24

25

26

27      [1]  An additional two categories of medallions less pertinent to this motion exist: medallions issued to
    wheelchair accessible vehicles and medallions leased month-to-month. Thirty-eight medallions remain in the
28  former category and three in the latter (Dkt. No. 26 ¶¶ 9.e–f).

        [2]  The pre-1978 medallions are no longer permitted to be transferred or sold (Dkt. No. 26 ¶¶ 9.a–b).

Many individuals who purchased medallions after 2010 took out loans to buy them. Almost always, lenders took a security interest in the medallion. The San Francisco Federal Credit Union financed hundreds of medallion sales (*id.* ¶ 16).

Shortly after this change, any best of times for medallion holders turned into the worst of times. Starting around 2012, "ride-sharing" technology companies (like Uber and Lyft) disrupted the taxi industry. In 2014, annual taxi trips from San Francisco Airport numbered over two million. By 2018, this number sank to slightly over one million. The credit union has foreclosed on over 160 medallions. The Transit Agency has not sold a single medallion since April 2016 (*id.* ¶¶ 21–22, 24, 49).[3]

## 2. THE 2018 REGULATIONS.

In 2017, the Transit Agency brought in an outside consulting group to study the industry and make recommendations. PFM Consulting and Schaller Consulting issued a report with three conclusions in May 2018. *First*, the report found that "[post-2010 m]edallion holders are under severe financial pressure." Between $1,500–$2,500 per month in obligatory loan payments distinguished the financial burden of the post-2010 medallion holders from the rest. *Second*, more than three quarters of existing medallions are "underutilized" as only 17% of medallions brought in at least $65,000 in annual revenue. *Third*, increased taxi wait times at the airport caused congestion. Taxis wait for over 90 minutes between fares in the airport taxi hold (the taxi waiting area in San Francisco Airport) (*id.* ¶¶ 24, 26–29).

Based on this report, the Transit Agency's in-house research and input it received from the industry (after holding six taxi town hall meetings between May and September 2018), the Transit Agency submitted a number of reforms to its board of directors. One of these reforms delegated authority to the Transit Agency's director to impose restrictions on the types of medallions authorized to pick up fares at the airport. The board adopted the resolution in October 2018 (*id.* ¶¶ 31–33).

---

[3] In a separate action, the credit union brought suit against the Transit Agency for $28 million in damages (San Francisco Sup. Ct. Case No. CGC-18-565325). The allegations included that the Transit Agency breached its obligation to foster and maintain a vibrant taxi industry, breached lender agreements, and made misrepresentations.

Pursuant to this authority, in December 2018, the Transit Agency director announced new regulations to go into effect February 1, 2019. These regulations governed taxi pickups at the airport, restricting access based on medallion. More specifically, the 1978–2010 and post-2010 medallion holders were still permitted to pick up fares at the airport. Pre-1978 medallions were not. Further, the 1978–2010 and post-2010 medallion holders no longer had the same access. The post-2010 medallions would be dispatched from one lot at a 3:1 ratio in comparison to the lot dispatching the 1978–2010 medallion holders (*id.* ¶¶ 34–35).[4]

The purported reasons for this rule were as follows. *First*, the rule aimed to reduce taxi congestion at the airport. Between holding lots and designating curbside areas, the airport can accommodate 476 taxis on site. These spots are often full. Taxis unable to find a spot then circle the terminal waiting for an opening. This leads to congestion (*id.* ¶¶ 37–39).

*Second*, the rule aimed to force more taxi cabs to operate in San Francisco. Because pre-1978 medallion holders may only service trips originating in San Francisco proper, individuals in San Francisco will purportedly have swifter access to taxis (*id.* ¶¶ 40–42).

*Third*, the rule aimed to drive revenue to the post-2010 medallion holders. To recall, most of these medallion holders paid $250,000 for their medallions. Most of these taxi drivers financed this purchase through loans. Now, these medallion holders owe between $1,500–$2,500 per month. This has led to over 160 post-2010 medallion foreclosures. These medallion holders have suffered the most. Defendants aver that a post-2010 medallion holder is estimated to earn less than $40,000 per year on average, whereas a medallion holder from 1978–2010 earns over $54,000 annually (*id.* ¶¶ 45–50).[5]

### 3. THIS ACTION.

In March 2019, six plaintiffs filed suit in California state court. A brief description of each plaintiff follows.

---

[4] Medallions issued to wheelchair-accessible vehicles remained permitted to pick up fares at the airport but had secondary access. Medallions leased month-to-month were prohibited from the airport (Dkt. No. 26 ¶ 34).

[5] A fourth reason applies solely to the wheelchair-accessible category of drivers, but is not pertinent to the claims here (Dkt. No. 26 ¶ 51).

According to the complaint, plaintiffs Patrick O'Sullivan and Sai Lee both hold pre-1978 medallions. Plaintiff George Horbal holds a 1978–2010 medallion. Plaintiffs Alliance Cab and S.F. Town Taxi Inc. lease medallions from medallion holders and re-lease those medallions to willing drivers. Plaintiff San Francisco Taxi Coalition is a nonprofit corporation with members who will be adversely affected by the 2018 regulations (Dkt. No. 1 at Exh. B ¶¶ 33–36).

In declarations filed in California state court, but not on this docket, plaintiffs added the following detail (plaintiffs' counsel attached prior declarations from plaintiffs to his own declaration) (Dkt. No. 22). Defendants did not object.

Plaintiff Patrick O'Sullivan is 87 years old. He paid between $16,000 and $18,000 for his medallion in 1970. (He noted that at the time, a typical house in San Francisco cost about $15,000.) He leases his medallion for $600/month. His other sources of income include social security, an auto-mechanic union pension, and a surviving spouse stipend.

Plaintiff Sai Lee is 72 years old. Plaintiff Lee paid $57,000 for a forced package deal for the medallion (the medallion plus one share of DeSoto Cab stock). He does not pick up work at the airport, but leases his medallion to a night-shift driver who does. If his night driver stops the lease, plaintiff Lee avers his income will be cut by more than half which will render him unable to pay bills, his mortgage, and the costs of daily living.

Plaintiff Horbal is 72 years old. He is confined to a wheelchair. He leases his medallion. His sole income is from social security ($1000/month) and the leased medallion ($600/month).

In April 2019, defendants removed the case here. Defendants are the City and County of San Francisco, the San Francisco Municipal Transit Agency, and the Transit Agency's director (Edward Reiskin).

On May 9, 2019, defendants moved for judgment on the pleadings under Rule 12(c) (Dkt. No. 12). The next day, the parties stipulated to shorten time to hear plaintiffs' motion for a preliminary injunction (Dkt. Nos. 15–17). Once the motion had been granted (Dkt. No. 18),

plaintiffs so moved (Dkt. No. 19).  Within days, the parties had fully briefed the preliminary

injunction motion (Dkt. Nos. 25, 29).  This order follows oral argument.

### ANALYSIS

Our court of appeals permits a sliding scale test to grant preliminary injunctions.  In this

branch of the preliminary injunction test, plaintiffs must demonstrate that: (1) serious questions

going to the merits were raised, (2) the balance of hardships tips sharply in the plaintiffs' favor,

(3) there is a likelihood of irreparable harm, and (4) that the injunction is in the public interest.

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–36 (9th Cir. 2011) (incorporating

factors from *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)).

Here, the parties both briefed a state court test, specifying only two factors: the

likelihood that plaintiffs will prevail on the merits and the balance of the hardships.  In any

event, plaintiffs have not met their burden under either test because while plaintiffs undoubtedly

will suffer irreparable harm, serious questions going to the merits have not been raised, both

sides will suffer hardship, and the injunction is not in the public interest.[6]

### 1.  SERIOUS QUESTIONS GOING TO THE MERITS.

Plaintiffs assert three claims.  *First*, plaintiffs have been deprived of their rights to equal

protection under both the federal and state constitution's equal protection clause.  *Second*, the

2018 regulation discriminated against plaintiffs' age in violation of California Government

Code Section 11135.  *Third*, defendants violated the California Environmental Quality Act in

promulgating the new rule.

### A.  Equal Protection Clause.

The parties agree that rational basis is the applicable standard to evaluate the rule at

issue.  Under this standard, regulations are "presumed valid, and this presumption is overcome

---

[6] Plaintiffs filed three requests for judicial notice under Rule 201(b)(2) (Dkt. Nos. 23, 30, 37).  The requests for notice include various statutes and codes, reports and memoranda, minutes of board of directors meetings, and e-mail communications.  The sources for the e-mail communications, various memoranda, and PowerPoint presentations, can reasonably be questioned and no information had been provided as to their sources in order to establish their accuracy (Dkt. Nos. 23 Exhs. B, D–F, H–K; 30 Exh. B; 37 Exh. A).  These requests are therefore **DENIED**.  The statutes, other code sections, board of director minutes, (Dkt. No. 23, Exhs. A, C, G, 30 Exh. A; 37 Exh. B), and the public comments in the body of Dkt. No. 30 do not change the outcome of this order and so those requests are **DENIED AS MOOT**.

only by a 'clear showing of arbitrariness and irrationality.' " *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1234 (9th Cir. 1994) (quoting *Hodel v. Indiana*, 452 U.S. 314, 331–32 (1981)). The government's distinctions "need only be drawn in such a manner as to bear some rational relationship to a legitimate state end." *Clements v. Fashing*, 457 U.S. 957, 963 (1982). "Classifications are set aside only if they are based solely on reasons totally unrelated to the pursuit of the State's goals and only if no grounds can be conceived to justify them." *Ibid*. "[T]hose attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it." *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993).

The group which benefits here are the holders of the post-2010 medallions. The government designed its rule to tilt the scales towards these medallion holders. Pre-1978 taxis will be entirely eliminated from competition at the airport. Furthermore, post-2010 medallion holders will have a dispatch advantage over the 1978–2010 medallion holders.

Plaintiffs' challenge, however, is not to show that the post-2010 medallion holders benefit under the rule. Rather, plaintiffs' challenge is to show that there is no rational relationship for a legitimate government purpose. They cannot do so. The different classes of medallion-holders are not similarly situated.

In the last decade, the post-2010 medallion holders have been hit hardest by the declining taxi industry. These medallion holders paid $250,000 for their medallions. They took out loans due monthly, many with a security interest in the medallion. Almost none has turned a profit due to the crushing effect of the loans. Over 160 of these medallions have already been foreclosed on. By contrast, the other two categories of medallion holders, perhaps because they have held their medallions for decades, have returned a profit. They don't have loans. It is also significant that the 1978–2010 category paid only $200 for their medallions.

Plaintiffs argue that all medallion holders are similarly situated because before these newly promulgated rules, all medallion holders had the same material rights. Even if true, this glosses over the crushing impact of the new taxi reality. The post-2010 medallion holders have been hit hardest due to the loans and higher fees.

7

Plaintiffs argue that our court of appeals has held that "mere economic protectionism for the sake of economic protectionism is irrational with respect to determining if a classification survives rational basis review." *Merrifield v. Lockyer*, 547 F.3d 978, 991 n.15 (9th Cir. 2008). This argument is inapposite. Here, the newly promulgated rule goes beyond mere economic protectionism. It prioritizes medallion holders who have significantly more expenses resulting from the medallion, who have had much less time (comparatively) to realize value from the medallions, and are disproportionate in precarious financial positions due to the crushing loan balances as a result of the medallions. This is particularly acute when considering that this category comprises approximately half of the entire San Francisco taxi industry.

### B.    Age Discrimination.

California Government Code Section 11135(a) provides that no person "shall, on the basis of . . . age . . . be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is . . . funded directly by the state or receives financial assistance from the state." Plaintiffs aver that the pre-1978 medallion holders are in their 70's or older and therefore the rule discriminates on the basis of age. This argument of disparate impact remains entirely unsupported. The overwhelming evidence is that the rule has been promulgated on the basis of taxicab efficiency and propping up those medallion holders most heavily hurt by the industry-wide crisis.

Although not briefed, here, it is worthwhile to note that the absolute ban against the pre-1978 medallion holders facially appears somewhat extreme. Yet, there is no evidence that the pre-1978 holders are any older than the 1978–2010 medallion holders. Accordingly, plaintiffs have not even shown there has been a disparate impact on older people. Pre-1978 medallion holders may be overwhelmingly over the age of 70, but so too, on average, may post-2010 medallion holders. That an individual purchased a medallion in the last ten years is not an indicator of their youth. Without any evidence to support their discrimination claim, plaintiffs have not shown that serious questions exist as to age discrimination against the pre-1978 medallion holders.

### C.    The California Environmental Quality Act.

The California Environmental Quality Act requires that public agencies conduct a preliminary review to determine whether an action is subject to the Act. *Muzzy Ranch Co. v. Solano Cty. Airport Land Use Comm'n*, 41 Cal. 4th 372, 379–80 (2007). The threshold question is whether an activity is defined as a "project" under California Code of Regulations Section 15378. If it is not a "project" it is not subject to CEQA. "Ordinances passed by cities are clearly activities undertaken by a public agency and thus potential 'projects' under CEQA." *Union of Med. Marijuana Patients, Inc. v. City of San Diego*, 4 Cal. App. 5th 103, 113 (2016).

Section 15378 defined a "project" as "the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment." Here, the Transit Agency concluded the rule changes were not a "project" under CEQA.

Plaintiff accuses the Transit Agency of giving the analysis short-shrift. Specifically, the Transit Agency purportedly never conducted a preliminary review to determine whether its proposed rule changes had the potential to cause a change in the environment. According to plaintiffs, "[i]t is difficult to understand how staff could arbitrarily conclude its rule changes would not have some impact on traffic . . ." (Dkt. No. 9 at 10). For evidence, plaintiffs illustrate that post-2010 taxis will drive to the airport without passengers to take advantage of the new rule. At the same time, the other two categories of medallion holders will rush back to the city because of the lack of options at the airport. This will create toxic gas emissions.

This argument is too speculative. We are not talking about millions or even thousands of taxis. In all, San Francisco has approximately 1500 taxis, almost all of which comply with its clean taxi program and are low emission vehicles. Specifically, of the 253 pre-1978 taxis, seven do not use reduced emissions technology. "Common sense leads us to conclude these concerns are too speculative or unlikely to be considered reasonably foreseeable." *Union of Med. Marijuana Patients, Inc. v. City of Upland*, 245 Cal. App. 4th 1265, 1276 (2016) (internal quotations omitted).

Plaintiffs argue it is not speculative because of the empty taxis commuting to and from the airport. However, plaintiffs do not substantiate this argument. No evidence is provided. For example, plaintiffs do not show how often taxis currently commute to and from the airport without fare to provide a point to compare.

### 2. BALANCE OF HARDSHIPS.

The balance of hardships are equal. On the one hand, with the rule in place, the 1978–2010 group will be relegated to a second-tier medallion at the airport and the pre-1978 medallion holders will lose all access to the airport. Both will accordingly lose the ability to lease their medallions as few will lease either a second-rate medallion or a medallion completely barred from picking up fare at the airport. Because most of these pre-1978 holders are over 70 years old, moreover, many may not be able to drive. The entire value of their medallion stems from leasing it. This value would evaporate.

On the other hand, without the rule in place, the post-2010 medallion holders will continue to suffer as discussed above. This may cause the post-2010 medallion holders to reach their tipping point causing their medallions to be foreclosed. Then, the value of their medallion would also evaporate. Accordingly, no matter which way this motion is decided, hardship will result.

### 3. IRREPARABLE HARM.

Both sides may incur irreparable harm. The loss of livelihood is particularly acute for medallion holders like plaintiff O'Sullivan who is 87 years old and plaintiff Horval who is confined to a wheelchair. For individuals like these plaintiffs, losing the lease-value of their medallion cannot then be substituted by finding alternate work or through a damages recovery at the conclusion of this action. Their harm would be immediate and irreparable.

### 4. PUBLIC INTEREST.

The public has an interest in the taxi industry not collapsing completely. This promulgated rule attempts to avoid this outcome. In addition, the rule allocates more taxicabs in the city thereby providing more competition for ride-sharing and potentially reducing prices

for consumers.  It also reduces congestion at the airport by minimizing the amount of taxis driving through.  Accordingly, the public interest factor disfavors injunctive relief.

## CONCLUSION

For the foregoing reasons, the motion for preliminary injunction is **DENIED**.

**IT IS SO ORDERED.**

Dated: June 6, 2019.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court

For the Northern District of California